UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
KINTEA MCKENZIE,

Plaintiff,

-against-

DANIEL HERNANDEZ, a/k/a TEKASHI 6IX9INE,

Defendant.

----------------------------------------------------------------------X

**VERIFIED COMPLAINT**

**PLAINTIFF DEMANDS A TRIAL BY JURY**

**1:26-cv-6677**

**PLAINTIFF KINTEA MCKENZIE**, by his attorneys, **KAISHIAN & MORTAZAVI LLC**, by **MARYANNE K. KAISHIAN, ESQ.,** an attorney duly admitted to practice before the United States District Court for the Eastern District of New York, hereby complains of **DEFENDANT DANIEL HERNANDEZ** as follows:

## PRELIMINARY STATEMENT

1. Defendant Daniel Hernandez ("Defendant" or "Defendant Hernandez"), also known by the stage name "TEKASHI 6IX9INE," has engaged in an ongoing, malicious campaign of defamation against Plaintiff Kintea McKenzie ("Plaintiff"), also known by the stage name "KOODA B." Plaintiff, a resident of Kings County, City and State of New York, brings the instant action for defamation against Defendant Hernandez.

2. As part of a series of press and public appearances by Defendant Hernandez, including on multiple dates in 2025 and 2026, Defendant Hernandez has repeatedly falsely accused Plaintiff on public platforms of serving as an informant to federal agents during a prior criminal investigation by the United States government, and has further accused Plaintiff of committing

serious criminal acts against Defendant and his family members. Defendant Hernandez knows these allegations to be untrue.

3. Due to these allegations, Plaintiff, who served his time and has attempted to reenter his community in Brooklyn, New York, as a prosocial member of the public and to continue his career as a music artist within the industry, has experienced significant damages. These damages include extensive personal and professional damage to his reputation, lost professional opportunities, ostracization, brigading of his social media accounts by members of the public repeating Defendant's false allegations against him, physical threats of violence, and legitimate fear for the safety of himself and his loved ones.

4. Defendant Hernandez acted as an informant for the federal government during a criminal RICO prosecution in the Southern District of New York between 2018 and 2020.

5. Both Defendant Hernandez and Plaintiff were defendants in that matter. Plaintiff did not serve as an informant. Since that time, Defendant Hernandez has engaged in a calculated public relations campaign in rap media to redirect the ire, violence, and professional scorn he has suffered for acting as an informant onto Plaintiff.

6. Defendant Hernandez is aware that falsely labelling Plaintiff as a "rat" or cooperator is dangerous and damaging; indeed, Defendant previously told the Court that he was both professionally blacklisted and beaten "to a bloody pulp" for being perceived as cooperating with the government. *See, e.g.*, *United States v. Jones, et al.*, 1:18-cr-00834 (PAE), Dkt. 731 at 32-35.

7. Defendant Hernandez maliciously intended to subject Plaintiff to this same fate, and has indeed caused Plaintiff to suffer significant damages.

8. Prior to his arrest and incarceration, Defendant Hernandez enjoyed career success and became a well-known artist in the music industry, beginning within the drill rap scene in Brooklyn and eventually garnering nationwide recognition. This includes through the breakout success of his debut mixtape, Day69, which was released in 2018 and included the track "Gummo," which was released as a single in September 2017 and went two-times platinum and reached #12 on the Billboard Hot 100, and the track "Kooda," which went platinum and was so-named after Plaintiff. At the time, Plaintiff and Defendant Hernandez were friends and fellow artists, both hailing from Brooklyn.

9. As a result of this early success, Defendant Hernandez enjoys a significant public platform, name recognition, and existing fanbase. He has utilized the same to disseminate false statements against Plaintiff as part of a dedicated defamation campaign.

10. Defendant Hernandez has levied false allegations to harm Plaintiff and to justify his own conduct in relation to Plaintiff and other individuals against whom Defendant Hernandez served as a valuable cooperator for the federal government.

11. Defendant Hernandez's false and defamatory statements against Plaintiff extend far beyond mere assertions that Plaintiff provided helpful information to investigators. Indeed, these false allegations are projections intended to protect Defendant Hernandez's own reputation and to damage Plaintiff's reputation and credibility.

12. In the years since the events detailed in the 2018 and 2019 criminal indictments at issue took place, Defendant Hernandez faced questions and criticism from members of the media, other music artists and industry members, and the public concerning the nature of his "extraordinary" level of cooperation with the United States government.[1]

---

[1] *See, e.g.*, **Exhibit 1**, Defendant Hernandez's Sentencing Minutes, *United States v. Jones, et al.*, (1:18-cr-00834 [PAE]), at 13:15-17 (AUSA: "[W]e characterize Mr. Hernandez, his cooperation as extraordinary."), 30:19-20

13. Unfortunately, Defendant Hernandez has intentionally chosen to respond to these inquiries by flip-flopping between falsely attributing his own actions to Plaintiff and falsely claiming that his actions were justified because Plaintiff committed various serious offenses against Defendant and/or his family.

14. Defendant, at all times, knew the statements he made to be untrue, and intended for these statements to harm Plaintiff, his reputation, and his standing.

15. Defendant Hernandez's false statements are part of an ongoing years-long pattern of defamation and further serve as republications of pre-2025 false statements made by Defendant Hernandez concerning Plaintiff's role in the federal investigation at issue.

16. Plaintiff now brings the instant action for defamation.

## PARTIES

17. **PLAINTIFF KINTEA MCKENZIE** is, and was at all relevant times, a lawful adult resident of Kings County, City and State of New York. Plaintiff is a rap and hip-hop artist who uses the stage name "Kooda B."

18. **DEFENDANT DANIEL HERNANDEZ** is an adult resident of the State of Florida. Defendant Hernandez is a rap and hip-hop artist who uses the stage name "Tekashi 6ix9ine."

## JURISDICTION

19. This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Plaintiff is a citizen of the State of New York, domiciled in Kings County, within the Eastern

(AUSA: "[Defendant's] cooperation was not only substantial, it was extraordinary."), 59:25-60:2 (The Court: "[Defendant] deserve[s] a great deal of credit at this sentencing on account of the extraordinary assistance [he] provided to the government.").

District of New York, and Defendant Hernandez is a citizen of the State of Florida, domiciled in Palm Beach County.

20. The monetary damages amount sought by Plaintiff exceeds $150,000.00, exclusive of interest and costs.

21. This Court has long-arm personal jurisdiction over Defendant Hernandez pursuant to New York State C.P.L.R. § 302(a)(1) because Defendant Hernandez transacts extensive business within the State of New York. Plaintiff's claims are substantially related to that business, as set forth below.

22. Defendant Hernandez has taken advantage of New York's unique resources in the entertainment industry and has purposefully availed himself of the benefits of conducting business in the State.

23. Defendant Hernandez conducts his business as a performing artist through New York business corporations. 6IX9INE TOURING, INC. (DOS ID 5383443) and 6IX9INE ENTERTAINMENT, INC. (DOS ID 5383437) are each active New York domestic business corporations, formed on July 27, 2018 and located in Nassau County, and each designates Defendant Hernandez himself, at 3000 Marcus Avenue, Suite 1W5, Lake Success, New York 11042, as the person to whom the New York Secretary of State shall mail process served against the corporation.[2]

24. Defendant Hernandez's other New York corporations include GOOBA, INC. (DOS ID 5752367), an active New York domestic business corporation formed on May 18, 2020 and located in Nassau County, which likewise designates Defendant Hernandez himself, at the same Lake Success address, as the person to whom the New York Secretary of State shall mail process,

[2] N.Y. Dep't of State, Div. of Corps., Entity Information, DOS ID 5383443 and DOS ID 5383437, available at: https://apps.dos.ny.gov/publicInquiry/ (last visited Oct. 13, 2026).

and TEKASHI69 TOURING INC (DOS ID 5218221), an active New York domestic business corporation formed on October 16, 2017 and located in Kings County.[3]

25. 6IX9INE TOURING, INC. has contracted for, and received payment for, Defendant Hernandez's paid appearances. *See* Complaint ¶¶ 5, 15, 17, *Dominguez v. Hernandez*, No. 1:21-cv-07051 (E.D.N.Y. Dec. 21, 2021).[4]

26. In that matter, the promoter's contract provided that 6IX9INE TOURING, INC. would receive $45,000 upon execution of the agreement, and that Defendant Hernandez would personally receive $75,000 in cash on the day of the performance. The promoter alleged that it transferred $45,000 to 6IX9INE TOURING, INC., and that Defendant Hernandez collected his $75,000 in cash on the day of the concert. *See* Complaint ¶¶ 5, 15, 17, 21, 30, *Dominguez v. Hernandez*, No. 1:21-cv-07051 (E.D.N.Y. Dec. 21, 2021).

27. Upon information and belief, Defendant Hernandez has likewise contracted for and been paid for his musical services through Tekashi69 Publishing, Inc., a New York business corporation with its principal place of business at 929 Schenectady Avenue, Brooklyn, New York 11203, which received payment for Defendant Hernandez's recorded vocal performance. *See* Complaint ¶¶ 7-8, 12, *Sleiman v. Tekashi69 Publishing, Inc.*, No. 1:19-cv-02298 (E.D.N.Y. Apr. 18, 2019).

28. Defendant Hernandez has applied to the United States Patent and Trademark Office to register the mark "6IX9INE," Serial No. 88808682, for, *inter alia*, entertainment services including audio and video recording and production, live music concerts, and motion picture and

---

[3] N.Y. Dep't of State, Div. of Corps., Entity Information, DOS ID 5752367 and DOS ID 5218221, available at: https://apps.dos.ny.gov/publicInquiry/ (last visited Oct. 14, 2026).

[4] Available at: https://www.courthousenews.com/wp-content/uploads/2021/12/tekashi-promoter-complaint.pdf (last visited Oct. 13, 2026).

television production, identifying his address as 1650 Broadway, Suite 505A, New York, New York 10019.[5]

29. Defendant Hernandez owns and controls 30 HERON DRIVE LLC (DOS ID 5834990), an active New York domestic limited liability company formed on September 14, 2020 and located in Nassau County, which designates the same Lake Success, New York address used by Defendant Hernandez's corporations for service of process.[6]

30. 30 HERON DRIVE LLC designates Oscar Hernandez, Defendant Hernandez's brother, as the person to whom the New York Secretary of State shall mail process. Upon information and belief, Oscar Hernandez resides at the property in a guest house, and Defendant Hernandez exercises control over the LLC and its sole known asset, his residence. Defendant Hernandez lives at the property with his family and has acknowledged that his brother lives in the guest house. This statement appears at 39:26 of the December 2, 2025 full-length Mansion Tour video.

31. On December 15, 2020, 30 HERON DRIVE LLC acquired, by warranty deed, Defendant Hernandez's residence at 6449 Duckweed Road, Wellington/Lake Worth, Florida, for $1,815,000, and remains its owner of record. Defendant Hernandez has publicly described that purchase as his own, stating, "when I bought the house, I bought it at 1.8 million, 1.79." This statement appears at 38:47 of the December 2, 2025 full-length Mansion Tour video.[7]

32. Defendant Hernandez made the statements described herein in connection with paid media appearances, including the VladTV interview and the Mansion Tour, which, upon

---

[5] Available at: https://uspto.report/TM/88808682 (last visited Oct. 12, 2026).

[6] N.Y. Dep't of State, Div. of Corps., Entity Information, DOS ID 5834990, available at: https://apps.dos.ny.gov/publicInquiry/ (last visited Oct. 13, 2026).

[7] Palm Beach County Property Appraiser, Parcel Control No. 00-41-44-35-01-000-2070, Official Records Book 32033, Page 760, available at: https://pbcpao.gov/Property/Details?parcelId=00414435010002070 (last visited Oct. 13, 2026).

information and belief, Defendant Hernandez recorded at that residence owned by his New York limited liability company.

33. Defendant Hernandez uses that residence as a production studio for his content business. In the Mansion Tour, Defendant Hernandez explained that he had contractors convert his house into "the dream streamer room" so that he could "shoot music videos" and "do some streaming" from the residence. These statements appear at 31:26 through 31:42 of the December 2, 2025 full-length video.

34. Defendant Hernandez was compensated for these appearances, including, by his own public account, a fee of $50,000 for the VladTV interview.[8]

35. Defendant Hernandez confirmed that figure on camera in a May 21, 2026 VladTV interview, stating, "So, you paid me 50,000 for the first interview," and adding, of his later appearances, "you're getting paid to talk." These statements appear at 07:51 through 08:51 of that video.[9] In a February 3, 2026 VladTV interview, Defendant Hernandez similarly referred to the money VladTV "paid me for . . . the first interview," and told DJ Vlad, "You got to pay me more." These statements appear at 1:26:08 through 1:26:24 and 1:54:25 through 1:54:33.[10]

36. Defendant Hernandez has publicly described his accountant's role in handling his income and tax obligations. These statements appear at 1:42:49 through 1:44:28 of the November 22, 2025 full-length VladTV video.[11] Upon information and belief, Defendant Hernandez's business and financial affairs, including the receipt of payment for his appearances, are managed

---

[8] Available at: https://x.com/XXL/status/2052438063616549354 (last visited Oct. 12, 2026).
[9] Available at: https://www.youtube.com/watch?v=MJDogJnw9N4 (last visited Oct. 15, 2026).
[10] Available at: https://www.youtube.com/watch?v=QW_ojhP4fpc (last visited Oct. 15, 2026).
[11] Available at: https://www.youtube.com/watch?v=UoDBJ7N6Fu0 (last visited Oct. 15, 2026).

through accountants and business managers located at the Lake Success, New York address designated by each of his New York entities.

37. Upon information and belief, Defendant Hernandez's paid media appearances described herein were entertainment services that Defendant Hernandez marketed, contracted for, and/or was compensated for through the New York business entities and the New York business address described above.

38. Defendant Hernandez markets himself, his music, and his paid media appearances to a New York audience as a Brooklyn artist. His X (formerly Twitter) profile identifies his location as New York, USA. In the paid appearances described herein, Defendant Hernandez repeatedly promoted himself as "[b]orn and raised in Bushwick, Brooklyn," and described the "Bloods in Brooklyn" and the New York federal prosecution in which he cooperated. These statements appear, for example, at 00:30 of the October 2025 full-length VladTV video, and at 17:55 through 18:04 and 1:26:41 through 1:27:58 of the May 21, 2026 full-length VladTV video.

39. Defendant Hernandez's identity as a Brooklyn artist, and his role in the New York federal prosecution of the Brooklyn-based Nine Trey gang, Plaintiff, and other Brooklyn, New York, residents, are the subject matter Defendant Hernandez sells in these paid appearances. The defamatory statements at issue were made in the course of, and as part of, that New York-centered business.

40. Defendant Hernandez's interview was intentionally directed to a New York audience, with content substantially concerning a New York-specific music scene and New York criminal indictment.

41. Defendant Hernandez's statements were further specifically geared towards large public audiences in the hip-hop and music entertainment industry.

42. Although the matter was prosecuted in the Southern District of New York, with Manhattan serving as the site of discrete events occurring as part of the indicted criminal conspiracy, the underlying criminal conspiracy arose in Brooklyn, New York, where Defendant Hernandez and, upon information and belief, the other charged defendants resided at the time of the indictment.

43. Defendant Hernandez intentionally agreed to conduct a lengthy series of interviews on this subject with VladTV, a music industry journalism and media company. VladTV is operated by Hot In Here, Inc. from offices at 240 West 35th Street in Manhattan, New York.[12]

44. Defendant Hernandez has further transacted business in New York by, *inter alia*, filming promotional content for his music in Bushwick, Brooklyn.[13]

45. Defendant Hernandez has regularly been physically present in New York, including on September 25, 2025, when he appeared in person before the United States District Court for the Southern District of New York, on December 5, 2025, when he appeared in person before the same Court to be sentenced for violations of his supervised release, and from January 6, 2026 through April 3, 2026, when he was held at the Metropolitan Detention Center in Brooklyn, New York. Defendant Hernandez's federal supervised release was imposed by, and has been the subject of ongoing proceedings before, the United States District Court for the Southern District of New York.[14]

46. Defendant Hernandez remains on supervised release through at least April 2027. This period of supervision is overseen by the Southern District of New York. Defendant Hernandez

---

[12] See Media Tenant Renews Garment District Lease with ATCO, Connect CRE (Dec. 1, 2020), available at: https://www.connectcre.com/stories/media-tenant-renews-garment-district-lease-with-atco/ (last visited Oct. 15, 2026).

[13] Available at: https://www.xxlmag.com/6ix9ine-resurfaces-video-location-vandalized/ (last visited Oct. 12, 2026).

[14] Available at: https://abc7ny.com/post/rapper-tekashi-6ix9ine-turns-himself-brooklyn-jail-mdc-3-month-sentence/18362953/ (last visited Oct. 12, 2026).

remains on supervised release pursuant to the criminal indictment at the heart of Plaintiff's claims and continues to engage in business within New York State, including travel to and from New York City and State and ongoing engagement concerning this criminal matter.

47. Since his indictment in November 2018, Defendant Hernandez has remained under the supervision and control of the Southern District of New York, and has been required to appear for proceedings, provide updates, and submit to ongoing monitoring overseen by the Southern District of New York in direct connection to the underlying claims. Defendant Hernandez has been required, most recently in January 2026, to report to a term of incarceration in Brooklyn's MDC jail following violations of the terms of his supervised release.

48. The Court imposed a sentence of 12 additional months of supervision following his release from that period of detention. Defendant Hernandez himself requested that he surrender to, and serve that term at, the MDC in Brooklyn, New York, rather than in Florida.

49. Plaintiff brings the instant Complaint within one year of October 16, 2025, October 20, 2025, October 22, 2025, and October 23, 2025, the dates on which Defendant Hernandez's defamatory statements were published and republished as, respectively, a full-length uncensored video released to VladTV's paying YouTube members, as a full-length video posted to VladTV's website for the general public, as a podcast episode, and as a full-length video posted to VladTV's YouTube channel, and within one year of Defendant Hernandez's further defamatory statements made on or about November 5, 2025, November 28, 2025, December 2, 2025, March 24, 2026, May 21, 2026, and the various other dates of Defendant's defamatory statements as described herein, in accordance with applicable law.

50. To the extent any of Defendant Hernandez's defamatory statements described below were made on dates that fall outside of the one-year statute of limitations, such statements

have been republished within the meaning of New York law such that the statute of limitations period has been renewed.

## VENUE

51. Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District, including publication to, and injury suffered by Plaintiff in, Kings County, City and State of New York.

52. Defendant Hernandez's statements concerned events that took place in Kings County and the City and State of New York, concerned a Kings County resident, were directed at and published to audiences in the State of New York, and caused injury to Plaintiff in Kings County, where Plaintiff resides.

## EXHIBITS

53. Plaintiff respectfully requests that this Court take judicial notice of the attached Exhibits:

a. **Exhibit 1, Defendant Hernandez's Sentencing Minutes**, taken in the United States District Court for the Southern District of New York on December 18, 2019, *United States v. Jones, et al.*, 1:18-cr-00834 (PAE), Dkt. 395;

b. **Exhibit 2, Plaintiff's Sentencing Minutes**, taken in the United States District Court for the Southern District of New York on December 1, 2020, *United States v. Jones, et al.*, 1:18-cr-00834 (PAE), Dkt. 585;

c. **Exhibit 3, Government Sentencing Letter Regarding Defendant Daniel Hernandez**, *United States v. Jones, et al.*, 1:18-cr-00834 (PAE), Dkt. 381 (Dec. 4, 2019) (excerpted; portions of the letter not cited herein have been omitted from the

Exhibit as attached, but are available in full on the public docket. All page citations herein refer to the letter as filed to the docket.); and

d. **Exhibit 4, Government Sentencing Letter Regarding Plaintiff Kintea McKenzie**, *United States v. Jones, et al.*, 1:18-cr-00834 (PAE), Dkt. 560 (Oct. 23, 2020) (excerpted; portions of the letter not cited herein have been omitted from the Exhibit as attached, but are available in full on the public docket. All page citations herein refer to the letter as filed to the docket.).

## STATEMENT OF FACTS

54. In 2017 and 2018, **PLAINTIFF KINTEA ("KOODA B") MCKENZIE** and **DEFENDANT DANIEL ("TEKASHI 6IX9INE") HERNANDEZ**, each music artists from Brooklyn, New York, collaborated and became friends through their common work.

55. In 2017, Defendant Hernandez released the song "Kooda," which was named after Plaintiff and in whose music video Plaintiff was featured. The song reached #50 on the Billboard *Hot 100*.

56. On November 18, 2018, Defendant Hernandez was arrested by federal agents who had been investigating Defendant Hernandez's involvement in criminal activity related to the Nine Trey gang in Brooklyn, New York.

57. By November 20, 2018, Defendant Hernandez provided federal prosecutors extensive information implicating Plaintiff by name in a separate crime, which Defendant Hernandez had induced Plaintiff to commit. *See* **Exhibit 1** at 19:6-14, 20:5-14.

58. This proffer was initiated by Defendant immediately. *See id.* at 19:6-14.

59. Defendant Hernandez, pursuant to this proffer agreement, informed federal prosecutors that, in June 2018, he had induced Plaintiff, then 19 years old, to arrange to shoot at Defendant Hernandez's rival, the music artist Chief Keef. Though a firearm was discharged, this individual was not injured.

60. Defendant Hernandez provided federal prosecutors with a detailed account of both Plaintiff's involvement and his own in this incident. *See id.* at 20:5-14, 26:21-27:6.

61. Defendant Hernandez stated that he had offered Plaintiff a sum of approximately $20,000 to arrange this shooting at Defendant Hernandez's rival, Chief Keef, that Plaintiff had accepted this offer, that Plaintiff had in fact arranged and/or planned the shooting, and that Defendant Hernandez was aware the target was not injured.

62. Prior to Defendant Hernandez's cooperation, federal prosecutors were not in a position to bring federal charges arising from the shooting. *See* Exhibit 1 at 14:19-15:1.

63. Prosecutors possessed surveillance footage depicting a third party, not Plaintiff, as the shooter. *See* Exhibit 1 at 14:21-25, 66:16-17; Exhibit 4, pp. 1-2. Defendant was aware of this fact and informed prosecutors that Plaintiff was involved in arranging the incident.

64. Prior to Defendant Hernandez's cooperation, federal prosecutors had also been unable to connect this shooting to the larger Nine Trey racketeering conspiracy. *See id.* at 14:22-15:1.

65. According to federal prosecutors, the information provided by Defendant Hernandez provided prosecutors with enough information to not only charge Plaintiff for his role in the shooting incident but to charge the shooting as an act in furtherance of the Nine Trey racketeering conspiracy. *See id.* at 26:21-27:6.

66. This was the beginning of what would become, according to federal prosecutors, Defendant Hernandez's role as an "open book" for the federal government. *Id.* at 20:13-14.

67. Defendant Hernandez—not Plaintiff—was the source of this information. *Compare* **Exhibit 1**, Defendant Hernandez's Sentencing Minutes (detailing Defendant Hernandez's extensive cooperation with the government), *with* **Exhibit 2**, Plaintiff's Sentencing Minutes, at 6:10-12:10, 15:6-9 (containing no mention of cooperation by Plaintiff, with the Court imposing a sentence within the stipulated Guidelines range and identifying as mitigating factors Plaintiff's acceptance of responsibility, personal history, community work, and letters of support).

68. At no time would Plaintiff inform federal agents of criminal activity concerning Defendant Hernandez or any other individual.

69. Based upon the information provided by Defendant Hernandez, Plaintiff was charged, in an indictment unsealed on January 31, 2019, with the crime for which Defendant Hernandez had provided prosecutors extensive details, including information directly connecting Plaintiff by name to both the shooting and a broader conspiracy. *See* Exhibit 1 at 26:21-27:6. Plaintiff was arrested and arraigned on February 8, 2019. *See* Exhibit 4, p. 2.

70. Plaintiff's arrest and arraignment did not occur until after Defendant Hernandez entered a plea of guilty. By this time, Defendant had engaged in multiple proffer sessions with the government in exchange for leniency.

71. Before Plaintiff was taken into custody, the government had already charged him, in a sealed superseding indictment unsealed on January 31, 2019, with participating in the June 2, 2018, shooting together with "others," and with aiding and abetting the use of a firearm. *See* Superseding Indictment, *United States v. Jones, et al.*, S6 18 Cr. 834 (PAE), Dkt. 91 ¶¶ 25, 28-29. The government's theory of Plaintiff's role in the shooting was thus established, based on

Defendant Hernandez's information and the government's own evidence, well before Plaintiff was arrested and arraigned on February 8, 2019. *See* Exhibit 1 at 14:19-25, 26:21-27:6; Exhibit 4, pp. 1-2. Defendant Hernandez was personally aware of each of these facts.

72. On June 3, 2019, Plaintiff entered a guilty plea based upon the information previously provided by Defendant Hernandez and known to the government. *See* Exhibit 4, p. 2.

73. Plaintiff's formal entry of a guilty plea, as is typical, required Plaintiff to allocute to the factual elements of the charge against him.

74. Plaintiff did not, and would not at any time, serve as a source of information for the government.

75. Plaintiff did not, and would not at any time, identify the individual who pulled the trigger.

76. In order to plead guilty in a criminal matter, defendants must allocute to the elements of the charges against them as laid out in the indictment submitted by the government.

77. Plaintiff was not the source for further details, identifying information, names, or novel information to the federal government.

78. Plaintiff was not a "rat," federal cooperator, or otherwise an informant in accordance with any formal, social, or colloquial understanding of these terms. Defendant Hernandez has specifically attempted to damage Plaintiff's reputation by projecting these allegations away from himself and onto Plaintiff.

79. Defendant Hernandez is, and was at all relevant times, fully aware Plaintiff had not "informed" the government of any information. Plaintiff had not acted as a source for any testimony or evidence. Plaintiff had not implicated anyone other than himself in entering his guilty plea, which was premised upon information previously provided by Defendant Hernandez himself

to federal prosecutors or otherwise compiled directly through non-testimonial evidence collected by the government without assistance from Plaintiff.

80. Defendant Hernandez was consistently providing information to federal prosecutors over the more than two months prior to Plaintiff's initial contact with the government at his February 8 arrest and arraignment.

81. Defendant Hernandez's information provided the federal government the basis for the indictment and prosecution of Plaintiff.

82. Defendant Hernandez cooperated with federal agents to convict Plaintiff for Defendant Hernandez's own gain, including a sentence constituting less than half of Plaintiff's prison term, despite Defendant Hernandez's extensive involvement in various crimes underlying the conspiracy indictment and Defendant's massive corresponding sentencing exposure.

83. Defendant Hernandez personally attended approximately twenty-six (26) proffer sessions in total with the federal government. *See* Exhibit 1 at 39:13-21.

84. Defendant Hernandez was aware that Plaintiff was not cooperating with federal investigators.

85. Defendant Hernandez was further aware that the information used to prosecute Plaintiff and included in Plaintiff's plea allocution was provided by Defendant Hernandez himself.

86. Defendant Hernandez was present at his own sentencing, where the "extraordinary" extent of his cooperation was detailed and lauded by all parties present as justification for a reduced sentence.

87. Defendant Hernandez was present as the Court credited him for "the extraordinary assistance [he] provided to the government." Exhibit 1 at 60:1-2.

88. Defendant Hernandez was likewise present when, during the same proceeding, the Court identified Plaintiff among "the defendants in this case who have pled guilty without cooperating." Exhibit 1 at 91:25-92:4.

89. Defendant Hernandez further cooperated with the federal government against multiple other individuals.

90. Defendant Hernandez was aware that the testimony he provided against Plaintiff, among others, constituted evidence in the cases against them.

91. The government submitted a cooperation motion on Defendant Hernandez's behalf to reduce his imposed sentence beneath the sentence demanded by the mandatory minimum sentences attached to certain charges and the applicable federal guidelines.

92. The Court calculated Defendant Hernandez's effective guidelines range to be 459 to 492 months' imprisonment. Exhibit 1 at 11:5–12:3.

93. On December 18, 2019, Defendant Hernandez was sentenced to a term of twenty-four (24) months in prison, followed by a five-year term of supervised release, for his involvement in various crimes in exchange for his cooperation, including against Plaintiff. *See* Exhibit 1 at 92:14-19. Defendant Hernandez served the final four (4) months of his initial sentence under house arrest.

94. Plaintiff received a sentence at the upper end of the stipulated guidelines range of 46 to 57 months. *See* Exhibit 2 at 6:16-7:1, 15:6-9.

95. On December 1, 2020, Plaintiff was sentenced to a term of incarceration of fifty-four (54) months in federal prison, followed by a three-year term of supervised release, for orchestrating the non-fatal 2018 shooting. *See* **Exhibit 2**, Plaintiff's Sentencing Minutes, at 16:14-19.

96. Defendant Hernandez's own detailed experiences of the effects of the label of cooperator further establish motive and malice against Plaintiff in making false statements against him.

97. Defendant Hernandez is well-aware of the reputational harm, damage to relationships, negative professional impacts, and safety risks faced by individuals known to have cooperated with investigators or accused of doing the same.

98. Indeed, on December 5, 2025, Defendant Hernandez informed the Court in the Southern District of New York that he was assaulted and/or personally confronted on at least eight (8) separate occasions by members of the public between 2020 and 2025 specifically due to his cooperation with the government. *United States v. Jones, et al.*, 1:18-cr-00834 (PAE), Dkt. 731 at 32-35.

99. Among other incidents, Defendant Hernandez told the Court that he was told to leave a Harlem restaurant because "[t]his is the wrong restaurant for a rat"; that he was told inside a Foot Locker store that "there's no shoes for rats" and was challenged to a street fight; that he was "assaulted with a drink to the face due to my cooperation" at a public event; that, "due to my cooperation," he was beaten "to a bloody pulp" and sent to the hospital; and that a coffin containing a dead animal was left in front of his home. *Id*.

100. Defendant Hernandez has further lamented that he cannot perform, work, or make money in the professional arena he shares with Plaintiff due to public knowledge of his cooperation in a criminal indictment involving his Brooklyn-based erstwhile friends and colleagues. *See, e.g., id.,* Dkt. 731 at 35 (Defendant Hernandez, speaking about the consequences of his cooperation, told Judge Engelmayer: "Music execs, people who have nothing to do with the street gang life,

gangs, they put a black ball where I'm not able to perform. Due to not being able to perform, IRS does a seizure 2023 where they auction off all my cars and my stuff. It's hard for me to work.").

101. Defendant Hernandez, through counsel, told the sentencing court that by testifying against his former associates, Defendant Hernandez "risked career suicide, given that the hip hop community seriously discourages cooperating with the government." *Id., Dkt. 388 at 3 (Dec. 11, 2019) (letter of defense counsel).* Specifically choosing platforms that would reach this hip hop community, Defendant Hernandez has disseminated defamatory statements concerning Plaintiff, thus attempting (and succeeding) in visiting similar harms as those he has suffered onto Plaintiff, despite their sharply different roles in the underlying prosecution.

## **FALSE STATEMENTS**

102. Though at various times Defendant Hernandez has acknowledged that he provided information to the federal government, he has also attempted to both distance himself from and/or justify his extensive cooperation and has slandered Plaintiff's name to do so.

103. Defendant Hernandez has cycled through conflicting claims that the scope of his cooperation was narrow, that the individuals he cooperated against, including Plaintiff, had committed various felony offenses against him, and/or that other individuals, including Plaintiff, had also cooperated in these matters. These claims are each false.

104. Defendant Hernandez continues to target and defame Plaintiff for Defendant Hernandez's own gain.

105. After each of Defendant's widely publicized false statements, Plaintiff has been confronted with increasing threats and social media harassment.

106. Though this harassment and disparagement is rampant on popular pages where Defendant is featured, attacks frequently tag Plaintiff and are also posted directly on Plaintiff's own videos, which he uploads to his pages used to promote his business and music.

107. These comments threaten violence against Plaintiff and/or repeat Defendant Hernandez's false claims.

108. In a recent example, on August 12, 2026, one comment on one of Plaintiff's own videos stated, "Stop talking like that when you be lacking kiddo," understood to indicate a direct threat of physical violence. The user's biography reads "#SNITCHK," a term for "snitch killer" or "kill snitches."

109. Other comments include similar threats. Statements directed at Plaintiff include "ratk," "snitchk," and various other statements also understood to indicate threats to Plaintiff in the aftermath of Defendant Hernandez's false statements.

110. Innumerable statements disseminate and repeat Defendant Hernandez statements, as Defendant intended. For example, on October 19, 2025, shortly after the initial release of the VladTV interview, one user commented on Plaintiff's posted video, stating, "Damnnnnn 69 just exposed that this n— told on the actual person that shot at Chief Keef? This why he only had got 5 years???"

111. On another one of Plaintiff's videos from this period, at least thirteen separate comments consisted simply of the emoji depicting a rat. Another depicted skulls and rat emojis together, understood to be a threat to Plaintiff ("death to rats.").

112. Plaintiff has been subjected to other threats and disparaging remarks directly.

113. These acts of harassment and threats are not limited to public posts on social media, and are intended consequences of Defendant's actions.

***<u>August 5, 2021, and Republications — Statements on Clubhouse</u>***

114. In or about early August 2021, Defendant Hernandez joined a "meeting room" on Clubhouse, a public social media platform.

115. This platform permitted members of the public and celebrities to gather in virtual "meeting rooms" where open discussions could be broadcast, recorded, and otherwise disseminated.

116. On that occasion, Defendant Hernandez joined a meeting room with several well-known figures in the music industry, including multiplatinum rap artist 21 Savage, generating significant public interest.

117. At the time of this broadcast, Plaintiff was still serving his sentence in federal prison.

118. Defendant Hernandez utilized a verified profile on Clubhouse, and his identity and participation in the meeting space is not in dispute.

119. During this public meeting, Defendant Hernandez was asked, "Why you tell on Kooda B? He ain't done nothing to you, man."

120. Defendant Hernandez denied that he had cooperated against Plaintiff, and responded, in relevant part, by falsely claiming, "Kooda B told on himself." This is false.

121. Defendant Hernandez further stated, "Kooda B pointed out the shooter." This is false.

122. The common understanding of "pointed out" is consistent with a person identifying another by name or providing their identity to police.

123. Defendant Hernandez further stated, "Kooda B told the feds who really shot the gun." This is false.

124. Plaintiff never provided the shooter's identity or description to the government. The government itself told the sentencing court that Plaintiff "could have implicated the others involved in this reckless shooting," but "did none of these things." *See* Exhibit 4, p. 3.

125. Defendant Hernandez's business partner, Cash "Wack100" McElroy Jones, was present on the platform and stated, "So he's a rat. Kooda B's a rat."

126. Defendant Hernandez doubled down to affirm these false allegations and further purported to provide "proof" of Plaintiff acting as a "rat" by reading a portion of *New York Daily News* coverage concerning Plaintiff's plea.

127. Defendant Hernandez intentionally and knowingly misrepresented this coverage to the listening public and industry members on the broadcast.

128. Defendant Hernandez was aware that he was misusing coverage of Plaintiff's plea to make false statements, and he did so intentionally to bolster his false claim that Plaintiff was the source of the information Defendant Hernandez had provided to the federal government concerning Plaintiff's and Defendant Hernandez's respective involvement in the 2018 shooting.

129. Defendant Hernandez was fully aware that Plaintiff's allocution was based upon facts provided by Defendant Hernandez himself to the federal government prior to Plaintiff's arrest.

130. Defendant Hernandez falsely stated that Plaintiff was the source of this information. Defendant Hernandez knew this to be false.

131. Defendant Hernandez further falsely stated that Plaintiff had identified the actual shooter. Defendant Hernandez knew this to be false. Defendant Hernandez knew that the shooter's identity has never been publicly revealed, that Plaintiff never identified this person, and that the shooter has never been charged.

132. Before Plaintiff was even arrested and arraigned, Defendant Hernandez had sat for approximately seven proffer sessions and entered his own guilty plea. See Exhibit 3, p. 2 (plea entered January 23, 2019). The indictment charging Plaintiff was not unsealed until January 31, 2019, and Plaintiff was not arrested and arraigned until February 8, 2019. *See* Exhibit 4, p. 2.

133. Defendant Hernandez was well-aware at the time these statements were made that they were false, and that it was Defendant Hernandez who provided the relevant information to the federal government. *See* Exhibit 1 at 19:6-14, 20:5-14, 26:21-27:6; *United States v. Jones, et al.*, 1:18-cr-00834 (PAE), Dkt. 342 at 428:7-23.

134. Defendant Hernandez is further aware that the government had contemporaneous surveillance footage showing Plaintiff's presence at the shooting scene and walking away prior to the shooting, before leaving in the same vehicle as the shooter, and depicting a different person actually firing a gun. The government required Defendant's assistance to charge Plaintiff with wrongdoing.

135. The United States Government has continually underscored the scope of Defendant Hernandez's cooperation, stating in its own sentencing recommendations:

> "The defendant's cooperation could not have been timelier. He provided information to law enforcement when they approached him on November 17, 2018 to discuss the threats made against him. He was arrested in the evening on November 18, was presented on the evening of November 19, and met with the Government on November 20. During proffers with the Government, the defendant provided information in a timely fashion, allowing the Government to investigate and charge additional crimes and defendants. **Absent the defendant's cooperation, the Government would not have been able to charge Denard Butler, Kintea McKenzie, Ellison, or Mack in the racketeering conspiracy and crimes in furtherance of the Nine Trey racketeering conspiracy.** Finally, the defendant's timely

> assistance allowed the Government to prepare for trial and pursue dispositions, ultimately resulting in convictions for all defendants." *See* Exhibit 3, p. 11 (emphasis added).

136. The government makes no such assertions regarding Plaintiff. *See, e.g.*, Exhibit 4, p. 3 ("[Plaintiff] could have done many things. He could have turned himself in. He could have implicated the others involved in this reckless shooting. . . . **He did none of these things**.") (emphasis added).

137. In the same submission, the government described Plaintiff's public statements after his guilty plea as asserting "that he did not cooperate and took a plea." *See* Exhibit 4, p. 6.

138. Defendant Hernandez has further intentionally misled third parties and utilized them as proxies to continue to make defamatory statements against Plaintiff on Defendant Hernandez's behalf.

139. Defendant Hernandez's August 2021 statements, though made outside of New York's one-year statute of limitations, have been republished through subsequent statements made by Defendant Hernandez reiterating these allegations in 2025 and 2026.

***<u>September 22, 2025, and Republications — One Night with Steiny Interview</u>***

140. One Night with Steiny is a long-form, unscripted, sit-down video series on YouTube, also released as audio on Apple Podcasts.

141. Episodes are cut into clips for Instagram, TikTok, and other social media platforms.

142. Defendant Hernandez was familiar with this podcast, its format, and its expected future republications when he appeared as a guest on the show.

143. On September 22, 2025, Defendant Hernandez conducted an interview with media outlet One Night with Steiny, which has 233,000 subscribers on YouTube.[15]

144. This interview was broadcast on YouTube, where it received at least 761,000 views within one week. As of October 12, 2026, the interview had been viewed more than one million (1,000,000) times on YouTube.[16]

145. This interview has been shared on additional streaming sites and on social media, making its reach incredibly broad.

146. This interview was also covered as a news story by third party media companies.

147. Defendant Hernandez appeared in person in the outlet's recording studio for this interview, which was broadcast via YouTube.

148. During the interview, Defendant Hernandez stated, "Now say this now. My shooter—clip this—my shooter was Kooda B, right? Kooda B love to say I told on him, right? The one who shot at Chief Keef. Kooda B tells prosecutors, look this up on . . . [the] docket, right? Look this up on PACER. . . . Kooda B took his plea agreement and he's home right now 'cause he told who really shot the gun." These statements appear at 30:20 through 30:45 of the interview.

149. At no time did Plaintiff identify the shooter.

150. At no time did Plaintiff engage in a proffer or information-for-plea exchange.

151. Despite knowing these statements to be false, Defendant Hernandez repeatedly vouched for the accuracy of his false allegations.

---

[15] Available in full at: https://www.youtube.com/watch?v=74149XP-ghM (last visited Oct. 12, 2026).
[16] *Id.*

152. During this exchange, Defendant Hernandez then defended his decision to cooperate by reiterating the false claim that the individuals he cooperated against, Plaintiff among them, had committed various serious offenses against Defendant Hernandez.

153. Defendant Hernandez stated, “If I kidnap you, am I your homie? If I f[***] your girl, am I your homie? If I take money from you without you knowing, am I a homie? So all the three things I just named, am I a homie for doing that to you? So did I tell on my homies?” The host replied, “No.” Defendant Hernandez exclaimed, “Exactly.”

154. Moreover, during the exchange concerning Plaintiff, Defendant Hernandez expressly directed both the platform and its audience to credit and republish his defamatory statements regarding Plaintiff, stating, “Clip this.”

155. This phrase is commonly understood—and used frequently by Defendant Hernandez throughout his public appearances in which he slanders Plaintiff—as a directive for the platform where he is appearing and its audience to take a section or “clip” from a longer-form video, such as a video podcast, for the purpose of resharing a specific quote or scene on various social media platforms that support easy sharing and reposting of short-form video and audio.

156. Both the platform and its audience heeded Defendant Hernandez’s express directive to “clip” and reshare Defendant Hernandez’s defamatory statements.

157. Consistent with Defendant Hernandez’s instruction, the segment was clipped and circulated widely.

158. On November 3, 2025, the segment containing Defendant’s false allegations of Plaintiff’s supposed involvement in offenses against him was clipped and republished on Instagram as a reel by the account RapMusic, which publishes “hip-hop news and videos” in the

form of video clips to its 5,000,000 followers. As of October 15, 2026, it has received over 38,000 "likes" and been shared thousands of times.

159. On November 27, 2025, the segment containing Defendant's false allegations of Plaintiff's supposed cooperation was clipped and republished on YouTube under the title "6ix 9ine pulled the trigger, kooda b snitched," with a caption tagging Plaintiff's own social media handle. As of October 15, 2026, that republication had been viewed more than 71,000 times.

160. Defendant Hernandez personally directed and intended for these future republications to take place.

161. Defendant Hernandez continued to repeat, republish, and widen his intended audience for defamatory statements of this nature against Plaintiff.

***October 2025 — VladTV Interview***

162. Defendant Hernandez sat for an interview with celebrity news media outlet VladTV, which has 6.23 million subscribers on YouTube alone. VladTV published the interview in October 2025.[17]

163. VladTV, a widely circulated hip-hop news and entertainment show, is hosted by celebrity disc jockey and personality DJ Vlad.

164. On October 16, 2025, VladTV published Defendant Hernandez's interview as a single, uncensored video of approximately four hours in length and made it available exclusively to paying members of VladTV's YouTube channel.[18]

165. VladTV promoted the October 16, 2025 release on its website, directing readers to "[w]atch the full interview now as a VladTV Youtube Member." DJ Vlad separately announced

[17] Available in full at: https://www.youtube.com/watch?v=j7PZ3lSli2A (last visited Oct. 12, 2026).
[18] Available at: https://www.vladtv.com/article/313312/tekashi-6ix9ine-tells-his-life-story-members-only-exclusive (last visited Oct. 12, 2026).

on X (formerly Twitter) that Defendant Hernandez's "full 4-hour uncensored interview drops later today for VladTV YouTube Members."[19]

166. On October 20, 2025, VladTV separately published, to the general public and without charge, Defendant Hernandez's interview in its entirety as a single video titled "Tekashi 6ix9ine Tells His Life Story (Full Interview)," on its website.

167. On October 23, 2025, VladTV posted the same full-length video to its YouTube channel.[20]

168. The October 16, 2025, release, the October 20, 2025, release, and the October 23, 2025, release were separate publications. They were released on different dates, to different audiences, in different versions: the October 16, 2025, release was an uncensored version available only to paying members, while the October 20, 2025, release was a version available to the general public without charge. The October 23 release was made available on YouTube, reaching an even more widespread audience.

169. On October 22, 2025, VladTV released the full interview, approximately three hours and forty-two minutes in length, as a podcast episode distributed through Apple Podcasts, Spotify, and other platforms.[21]

170. As of October 12, 2026, the October 16, 2025, members-only release had been viewed more than 20,000 times on YouTube, and the public full-length video, posted to VladTV's website on October 20, 2025 and to YouTube on October 23, 2025, had been viewed more than 1.7 million (1,700,000) times on YouTube.

---

[19] Available at: https://x.com/djvlad/status/1978770419852136763 (last visited Oct. 12, 2026).

[20] Available in full at: https://www.vladtv.com/article/313348/tekashi-6ix9ine-tells-his-life-story-full-interview (last visited Oct. 6, 2026).

[21] Available in full at: https://podcasts.apple.com/au/podcast/tekashi-6ix9ine-tells-his-life-story/id1737050770?i=1000733030575 (last visited Oct. 6, 2026).

171. Individual segments of the interview have been separately viewed hundreds of thousands of times on YouTube.[22]

172. Defendant Hernandez appeared on camera for this interview.

173. Defendant Hernandez was paid to participate in this interview. Defendant Hernandez later confirmed on camera that VladTV paid him $50,000 for this interview. These statements appear at 07:51 through 08:51 of the May 21, 2026 full-length VladTV video and at 1:26:08 through 1:26:24 of the February 3, 2026 full-length VladTV video.

174. This interview has been shared on additional streaming sites and on social media, including TikTok, Instagram, and Twitter/X, making its reach even more broad.

175. During this interview, Defendant Hernandez was asked to discuss his federal criminal case.

176. During this interview, Defendant Hernandez doubled down on his allegations, denying that he had provided the information used to prosecute Plaintiff.

177. The host named Plaintiff as an individual who was charged and against whom Defendant Hernandez had provided information, and asked Defendant Hernandez to elaborate on his decision to cooperate.

178. In denying his role in providing information against individuals including Plaintiff, Defendant Hernandez stated, "The only person I sat on the stand, and like I said, owned up to it, was Harv," referring to Anthony "Harv" Ellison. This is false.

179. In fact, Defendant Hernandez took the stand and testified about Plaintiff during the September 2019 federal criminal trial of Anthony Ellison. *See United States v. Jones, et al.*, 1:18-cr-00834 (PAE), Dkt. 342 at 428:7-12 (Defendant Hernandez: *I was in California at the time, and*

[22] Available at: https://www.youtube.com/watch?v=j7PZ3lSli2A (last visited Oct. 12, 2026).

*I gave orders to my friend Kooda to shoot at [Chief Keef]*. AUSA: *And how did that come about?* Defendant Hernandez: *I was in California in a hotel room. I was on the phone with Kooda. He said, I got eyes on -- like, I'm going to have eyes on him. I said make sure I have 20 bands [$20,000] on him.*) (Sept. 18, 2019) (bracketed definition added).

180. Despite naming his hit song "Kooda" after Plaintiff (*see United States v. Jones, et al.*, 1:18-cr-00834 (PAE), Dkt. 340 at 226:12-16), and stating under oath that Plaintiff was Defendant Hernandez's friend even at the time Defendant Hernandez provided testimony (*see id.*, Dkt. 342 at 428:7-8), Defendant Hernandez also vehemently denied cooperating against "friends," and further insisted, "I told on n***** who did mad s***, right? . . . Friends wouldn't kidnap you."[23]

181. In so stating, Defendant Hernandez denied cooperation against Plaintiff, or claimed, in the alternative—if Defendant Hernandez *had* cooperated against Plaintiff—that Defendant Hernandez's cooperation was justified because Plaintiff had committed serious felony act(s) against Defendant Hernandez.

182. Neither statement is true. Both statements are false and defamatory.

183. Defendant Hernandez's statement was not an isolated remark.

184. Since his release from federal custody, Defendant Hernandez has repeatedly and publicly justified his cooperation by claiming that the people against whom he cooperated—which

[23] Despite this sworn testimony, and as part of his ongoing attempt to diminish and discredit Plaintiff, Defendant Hernandez has subsequently claimed that he came up with the name "Kooda," a name Plaintiff has used for most of his life. In an interview published on January 17, 2026, on the SAY CHEESE! YouTube channel, which, as of October 15, 2026, had been viewed more than 684,000 times, Defendant Hernandez stated of his song titles: "Billy, **Kooda**, Gummo, Tati, Fifi, I just made all that shit up. . . . [T]hem names are made up. . . . Just whatever comes to my head." These statements appear at 1:01:44 through 1:02:12 of the interview. In the same interview, Defendant Hernandez again justified his cooperation by asking, "Why be loyal to [people] that's not loyal to [me]? . . . So, should I be loyal to them and take 47 years?" These statements appear at 1:21:24 through 1:21:48 of the interview. *Available at*: https://www.youtube.com/watch?v=pAjA81f1sFc (last visited Oct. 15, 2026).

Defendant Hernandez has, at various times, acknowledged to include Plaintiff specifically—kidnapped him, robbed him, plotted to kill him, and stole from him.

185. On May 8, 2020, during a widely viewed Instagram Live broadcast, Defendant Hernandez generally asked those he had cooperated against, "Where was the loyalty when you was caught on the wire tap tryna kill me?," "when you tried to kidnap my mother?," and "when you stole millions of dollars from me?"[24]

186. In a September 2020 interview with The New York Times, Defendant Hernandez stated, "When I was kidnapped, was I a victim? Did I cooperate? No. . . . When they were stealing money from shows, did I cooperate? No."[25]

187. Defendant Hernandez repeated these accusations in a full-length VladTV interview published on May 21, 2026, which, as of October 14, 2026, had been viewed more than 446,000 times on YouTube. In it, Defendant Hernandez stated, "These guys kidnapped me, . . . my [baby] moms, did this, did that. . . . Where was the loyalty when you was sleeping with my baby mother? Where was the loyalty when you was caught on the wire tap trying to kill me? Where was the loyalty when you tried to kidnap my mother? Where was the loyalty when you were stealing millions of dollars from me?" These statements appear at 31:37 through 32:02 of the video.

188. During the October 2025 VladTV interview, DJ Vlad walked Defendant Hernandez through the January 2019 charges in the federal case. DJ Vlad stated, "on January 22nd, more Nine Trey gangsters get charged." Defendant Hernandez responded, "So January 22nd was the day we all went into court together." DJ Vlad continued, "Kooda B gets charged. Drama and Harv get

[24] Available at: https://www.complex.com/music/a/cmplxtara-mahadevan/6ix9ine-apologizes-to-fans-explains-why-he-snitched (last visited Oct. 15, 2026).
[25] Available at: https://www.nytimes.com/2020/09/02/arts/music/6ix9ine-interview.html and https://www.nme.com/news/music/tekashi-6ix9ine-discusses-testifying-against-nine-trey-in-first-post-prison-interview-2743690 (last visited Oct. 15, 2026).

charged. Kooda B was indicted for attempting to shoot a Chief Keef." This exchange appears at 2:33:34 through 2:33:58 of the full-length video.

189. Less than five minutes later, DJ Vlad turned to Defendant Hernandez's own guilty plea, stating, "along with your guilty plea, you agree to cooperate against everyone else," and asking Defendant Hernandez, "What led up to that particular moment?" This exchange appears at 2:37:33 through 2:38:25 of the full-length video.

190. In reply, Defendant Hernandez answered, "the kidnapping, the wire taps, the money, right, that was being stolen from promoters, my [baby] moms. What else more do you need? My mom." He continued, "I told on n***** who did mad s***, right? . . . Friends wouldn't kidnap you." These statements appear at 2:38:25 through 2:39:10 of the full-length video.

191. Against that backdrop, when Defendant Hernandez told VladTV's audience that he cooperated against Plaintiff because of "the kidnapping, the wire taps, the money . . . that was being stolen from promoters, [and] my [baby] moms," and that he "told on n***** who did mad s***" to him, and later identified Plaintiff by name as one of the people he informed on who were "disloyal" to him, listeners reasonably understood Defendant Hernandez to be accusing Plaintiff of those crimes. Defendant Hernandez intended that meaning.

192. Plaintiff has not committed any such criminal acts.

193. Plaintiff never kidnapped, robbed, threatened, extorted, wiretapped, or stole from Defendant Hernandez, his family, or any promoter, and has never been charged with or accused by the government of any such conduct.

194. The only conduct for which Plaintiff was charged was related to his involvement in arranging the June 2, 2018, shooting that Defendant Hernandez himself requested and, by Defendant's own account, paid for. *See* Exhibit 1 at 26:21-27:6; Exhibit 3, p. 5.

195. Through these statements and others made during this interview, Defendant Hernandez continued his defamation campaign against Plaintiff.

196. Each October 2025 release reached new audiences, including paying members of VladTV's YouTube channel, members of the general public who viewed the full-length video, and podcast listeners who do not use YouTube.

197. Defendant Hernandez sat for this interview knowing, and intending, that VladTV would publish and promote his statements in multiple formats, including as clips, in multiple parts, and in full, and across multiple platforms. Defendant Hernandez's appearance was for the purpose of publication, and the October 2025 release was authorized by, and reasonably foreseeable to, Defendant Hernandez.

198. Upon information and belief, Defendant Hernandez authorized VladTV, by written release, license, or other agreement, to publish and distribute the interview in all formats and on all platforms, including as shortened clips, as a full-length video, and as a podcast episode, and/or retained the right to approve the manner and timing of its release.

199. Upon information and belief, Defendant Hernandez has given prior interviews to VladTV and was aware, at the time he sat for the interview, that VladTV routinely publishes its interviews through multiple formats and platforms over a period of time, including as full-length videos and podcast episodes.

200. Upon information and belief, Defendant Hernandez and/or his representatives coordinated with VladTV concerning the release of the interview, including the full-length video posted to VladTV's website on October 20, 2025 and to YouTube on October 23, 2025, and the October 22, 2025 podcast episode.

201. Upon information and belief, Defendant Hernandez promoted the October 2025 releases on his own social media accounts, thereby participating in and adopting their publication.

202. Defendant Hernandez therefore approved of, participated in, and exercised control over the decision to republish his statements described herein, including, *inter alia*, on October 16, 2025, October 20, 2025, October 22, 2025, and October 23, 2025.

***<u>November 2025 — Adin Ross Livestream</u>***

203. In or about early November 2025, Defendant Hernandez appeared on a livestream with streamer Adin Ross, DJ Akademiks, and Wack100. A full recording of the livestream was published on YouTube on November 5, 2025, and, as of October 14, 2026, had been viewed more than 540,000 times.[26]

204. Asked whether he was a "proud snitch," Defendant Hernandez explained that the people he informed on "was disloyal to me," and that "when they were disloyal to me, I paid them back with the same loyalty they show me."

205. Defendant Hernandez then named Plaintiff among them: "Like I think Kooda came home, Ro came home, Crippy came home, Drama came home, Mel Murda came. A lot of them came home." He continued, "I never ratted on none of my friends. These people wasn't my friends. . . . the loyalty died when they broke it." These statements appear at 1:37:12 through 1:38:04 of the recording.

206. By these statements, Defendant Hernandez again told a mass audience that Plaintiff had been "disloyal" to and "broke" loyalty with Defendant Hernandez, the same false justification Defendant Hernandez offered on VladTV.

[26] Available at: https://www.youtube.com/watch?v=lrTXgaIHx8Q (last visited Oct. 14, 2026).

207. Plaintiff never informed on or cooperated against Defendant Hernandez or any other individual. Plaintiff never committed a crime against Defendant.

208. Moreover, during this same livestream, Defendant Hernandez again justified his cooperation by claiming that he could not believe that "my own friend that I gave $30,000 to . . . would kidnap me… At the trial or at the arraignment or at the proffers with the government, I didn't feel like I would hear [what] they said about me after I helped them." These statements appear at 2:22:29 through 2:23:17 of the recording.[27]

209. In the context of Defendant Hernandez's many public statements concerning Plaintiff, and given his statements in the same appearance, this detail is clearly recognizable as Defendant Hernandez identifying Plaintiff to the audience as cooperating against him and in committing the serious offense of kidnapping.

210. Defendant Hernandez has said publicly that he offered Kooda $30,000, and this figure has been repeated in various public forums, including Defendant's VladTV appearances.

211. Defendant Hernandez then stated, "They won't clip that though." The show hosts stated, "They will. You got to tell them. They'll do it… Yeah. Tell them to clip it. They'll clip it." The "they" Defendant Hernandez and the hosts were referring to is the wide public audience Defendant Hernandez understood would receive and republish these defamatory statements.

212. Defendant Hernandez's statements are also an admission: Defendant Hernandez concedes he informed on Plaintiff, contradicting his prior claims that he had not provided information regarding Plaintiff to the government.

[27] Available at: https://www.youtube.com/watch?v=OeAnGVSO-9E (last visited Oct. 15, 2026).

***November 28 and December 2, 2025 — VladTV Mansion Tour***

213. On November 28, 2025, VladTV published on YouTube a video segment in which Defendant Hernandez, appearing on camera, gave DJ Vlad a tour of Defendant Hernandez's residence in Florida (the "Mansion Tour"). VladTV published the Mansion Tour in multiple parts between November 27, 2025, and December 1, 2025, and on December 2, 2025, published the Mansion Tour as a single full-length video.[28]

214. On March 24, 2026, VladTV again published the full-length Mansion Tour on YouTube.[29]

215. As of October 12, 2026, the November 28, 2025, segment had been viewed more than 260,000 times on YouTube, and the December 2, 2025, full-length video had been viewed more than 860,000 times on YouTube.[30]

216. During the Mansion Tour, Defendant Hernandez proposed a "where are they now" segment comparing himself, side by side, to Plaintiff and to another individual who had been charged in the federal investigation described above, referring to Plaintiff by name and mocking Plaintiff for residing in public housing.

217. After cooperating with federal investigators in a matter centered on events and individuals within Manhattan and Brooklyn, Defendant Hernandez purchased a home in Florida and no longer resides in New York State.

218. Plaintiff still resides in Brooklyn, New York.

[28] Available at: https://www.youtube.com/watch?v=Y5PIzg_tAx8 (last visited Oct. 12, 2026).
[29] Available at: https://www.youtube.com/watch?v=VNCeO-_jOOM (last visited Oct. 12, 2026).
[30] Available at: https://www.youtube.com/watch?v=aC4cVs8ga8A (last visited Oct. 12, 2026).

219. DJ Vlad then asked Defendant Hernandez, "Kooda B never turned on you, did they?" at 10:41 of the November 28, 2025, segment and at 18:30 of the December 2, 2025, full-length video.

220. Defendant Hernandez responded that "when all this was happening . . . they didn't keep it real." Moments later, Defendant Hernandez added that others "were telling on their friends. I never told on a friend of mine." These statements appear at 19:45 through 19:54 of the December 2, 2025, full-length video.

221. Asked point-blank whether Plaintiff had "turned on" him in the context of serving as a federal informant, Defendant Hernandez answered that Plaintiff had, "after the fact," reaffirming his false contention that Plaintiff had served as an informant and/or committed serious offenses against him. This is false.

222. In a separate segment of the Mansion Tour, published on December 1, 2025, and again within the December 2, 2025, full-length video, Defendant Hernandez mocked Plaintiff by name while showing off the amenities in his Florida home, stating that "people like Kooda B . . . will have to wipe their ass with like . . . hard tissue," further demonstrating Defendant Hernandez's ill will toward Plaintiff.[31]

***<u>Ongoing Conduct</u>***

223. Defendant Hernandez has continued to discuss Plaintiff and publicly paint him in a false light in public appearances.

224. For example, on June 16, 2026, Defendant Hernandez appeared on camera in a livestreamed interview with podcaster "Mama Duck" on the Trap Lore Ross YouTube channel. An edited version was published the same day under the title "Mama Duck VS 6ix9ine" and, as of

---

[31] Available at: https://www.youtube.com/watch?v=lF-9xfemWW0 (last visited Oct. 12, 2026).

October 14, 2026, had been viewed more than 124,000 times. The full livestream has been viewed more than 72,000 times.[32] In this appearance, Defendant Hernandez reiterated claims including that Plaintiff "told the feds" information.

225. On or about September 1, 2026, Defendant Hernandez spoke with media personality DJ Akademiks during a livestream broadcast concerning an active federal criminal trial. A recording of this conversation was published on YouTube on September 2, 2026 under the title "DJ Akademiks Speaks With 6ix9ine About The Lil Durk Case As OTF Vonnie Is On The Stand," and, as of October 12, 2026, had been viewed more than 10,000 times on that channel alone. During this conversation, DJ Akademiks stated that Defendant Hernandez had "paid 30K to [Kooda B] to shoot at Chief Keef," and Defendant Hernandez reiterated his assertion that Plaintiff "told the feds" information. These statements appear at 20:49 through 21:56 of the recording.

226. Each instance of Defendant Hernandez engaging in defamatory conduct against Plaintiff causes renewed harassment, threats, and disruption to Plaintiff's life, which he is endeavoring to rebuild.

227. Plaintiff therefore also seeks injunctive relief.

## DAMAGES

228. Plaintiff has endeavored to reenter his community post-sentence and to be a positive member of his community in Brownsville, Brooklyn.

229. However, Defendant Hernandez's harassment campaign has caused significant damage to Plaintiff.

[32] Available at: https://www.youtube.com/watch?v=bPflxVumYhE and https://www.youtube.com/watch?v=auBCDf0wpAs (last visited Oct. 15, 2026).

230. Plaintiff has received death threats, including on social media accounts, and other threats to his physical safety.

231. Plaintiff remains on federal supervised release.

232. Defendant Hernandez's statements have caused Plaintiff to experience an increased level of supervision given concerns for Plaintiff's safety.

233. Defendant Hernandez's statements have caused Plaintiff to lose friendships and community ties.

234. Plaintiff has endeavored to continue his work as a recording artist.

235. Defendant Hernandez's conduct described herein has caused significant damage to Plaintiff's reputation and standing within his community and has damaged his earning potential.

236. Defendant Hernandez's conduct described herein has caused Plaintiff to lose professional standing and connections.

237. Defendant Hernandez's conduct described herein has caused professional contacts to sever ties with Plaintiff.

238. Defendant Hernandez's conduct described herein has caused individuals with standing in Plaintiff's community and in the music recording space to sever ties with Plaintiff.

239. As a result of Defendant Hernandez's conduct, Plaintiff has suffered reduced earning potential.

240. As a result of Defendant Hernandez's conduct, Plaintiff has experienced fear and concern for himself and his loved ones.

241. As a result of Defendant Hernandez's conduct, and with Defendant Hernandez's intent and full knowledge, Plaintiff has been subjected to further harassment, including on social

media and online platforms, upon which Plaintiff is reliant to generate interest and financial gain related to his music career and reputation.

242. Following each of Defendant Hernandez's statements, and in the time since, Plaintiff has received messages, texts, calls, and inquiries from family members and loved ones concerned for his safety and seeking clarification regarding Plaintiff's role in the federal investigation.

243. Following each of Defendant Hernandez's statements, and in the time since, Plaintiff has received messages, texts, calls, and inquiries from individuals with potentially hostile intentions demanding to know Plaintiff's role in the federal investigation.

244. Following each of Defendant Hernandez's statements, and in the time since, Plaintiff has been subjected to messages, comments, and social media posts labeling Plaintiff a "rat," a "snitch," and otherwise repeating Defendant Hernandez's false allegations.

245. These experiences have caused Plaintiff significant emotional distress, hypervigilance, and fear.

246. These consequences were entirely foreseeable to Defendant Hernandez and/or were personally orchestrated by Defendant Hernandez.

247. Defendant Hernandez has damaged Plaintiff's emotional wellbeing, his professional standing, his financial status and prospects, and his reputation in these and other ways and has caused further injuries and damages to Plaintiff.

248. The full extent of Plaintiff's damages is not yet known, and the injurious effect of Defendant Hernandez's conduct is ongoing.

## CLAIM FOR RELIEF

### Defamation *Per Se*

249. Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

250. Defendant Hernandez's statements tended to injure Plaintiff's trade, business, and/or profession.

251. Defendant Hernandez specifically and intentionally made and disseminated these false statements through outlets, platforms, and audiences with influence over both Plaintiff's and Defendant's professional networks and through multiple forums each likely to be widely consumed by the public.

252. Defendant Hernandez's statements falsely accused Plaintiff of serving as a cooperator with the federal government and falsely attributed Defendant's own actions, for which he has faced myriad negative ramifications, to Plaintiff.

253. Defendant Hernandez's statements falsely accused Plaintiff of committing serious felony crimes including kidnapping and/or grand larceny against Defendant and/or his close family members.

254. Defendant Hernandez knew these statements to be false.

255. Defendant Hernandez made these statements intentionally to damage Plaintiff's standing, to negatively affect Plaintiff's credibility, and to protect Defendant Hernandez's own reputation.

256. Defendant Hernandez's statements were capable of being proven false.

257. Statements made under oath by Defendant Hernandez, and in Defendant Hernandez's presence, in the United States District Court for the Southern District of New York establish these statements as false.

258. As evidenced by Defendant Hernandez's desperation to deny and/or justify accurate accounts of his own cooperation, Defendant Hernandez recognizes the false allegations he has levied against Plaintiff to be harmful and potentially dangerous.

259. Defendant Hernandez's statements were not song lyrics, a diss track, or part of a rap battle. They were made in long-form interviews, podcasts, and livestreams in which Defendant Hernandez presented himself as a firsthand source of factual information about his own federal case, and in which he told listeners that his account could be confirmed in public court records, urging them to "[l]ook this up on PACER."

260. Defendant Hernandez's statements accuse Plaintiff of precisely what Defendant Hernandez himself did. It was Defendant Hernandez who began proffering with federal prosecutors the morning after he was ordered detained, who supplied the information used to charge Plaintiff, and who testified about Plaintiff at trial. *See* Exhibit 1 at 19:6-14, 26:21-27:6; *United States v. Jones, et al.*, 1:18-cr-00834 (PAE), Dkt. 342 at 428:7-23; Exhibit 3, p. 11. Defendant Hernandez knew, from his own conduct, that Plaintiff had not cooperated.

261. Defendant Hernandez made these statements out of personal ill will toward Plaintiff, as shown by his repeated mocking of Plaintiff by name, including ridiculing Plaintiff for residing in public housing and proposing a "where are they now" segment comparing his own wealth to Plaintiff's circumstances.

262. Defendant Hernandez acted with actual malice against Plaintiff by intentionally making—and republishing—defamatory statements concerning Plaintiff that Defendant Hernandez knew to be false.

263. Defendant Hernandez further acted with common-law malice against Plaintiff in making these statements.

264. Defendant Hernandez was motivated by ill-will for Plaintiff and/or otherwise intended to injure, damage, discredit, ostracize, blackball, and disgrace Plaintiff.

265. Defendant Hernandez's malice toward Plaintiff is evinced through the conduct described herein, including, *inter alia*, through Defendant's contemporaneous conduct in mocking and disparaging Plaintiff, through Defendant's clear personal knowledge of the effects these false statements are likely to have on Plaintiff, and otherwise through the clear pattern of conduct undertaken by Defendant Hernandez in relation to Plaintiff.

266. Defendant Hernandez's conduct, including that described herein, was of such an intentional and malicious nature to justify punitive damages against him.

267. As a result of Defendant Hernandez's conduct, Plaintiff has suffered significant damages and injuries, including, *inter alia*, reputational damage, both personally and professionally as a recording artist; lost professional opportunities; loss of employment; lost studio recording time; damage to close personal relationships; social isolation; emotional damages; fear for his safety and that of his loved ones; anxiety; hypervigilance; decreased enjoyment in daily life; increased supervision and scrutiny while Plaintiff also remains on supervised release; threats of physical violence; harassment on social media platforms, on both his personal and professional accounts, by members of the public who believe Defendant's false statements concerning Plaintiff; and other damages.

## REPUBLICATION

268. Defendant Hernandez's defamatory statements made in 2025 and 2026, described above, constitute republication of Defendant Hernandez's defamatory statements made in August 2021, also described above.

269. All such statements were false, known to Defendant Hernandez to be false, were inherently damaging due to their content, and caused damage to Plaintiff.

270. The false premise of Defendant Hernandez's defamatory statements is that Plaintiff provided novel information implicating individuals in criminal activity to the federal government, making Plaintiff a "rat," a cooperating witness, or otherwise an informant in a federal prosecution.

271. Defendant Hernandez's knowingly false statements on Clubhouse in 2021 and to One Night with Steiny in September 2025 were public, defamatory, and damaging to Plaintiff.

272. Defendant Hernandez reiterated his false statements defaming Plaintiff in 2025 and 2026 by intentionally engaging with different platforms.

273. Defendant directly participated in and/or approved republication by agreeing to appear on the cited platforms with the intent, understanding, and/or expectation that his statements would be shared across multiple platforms to wide audiences in different forms, including both shortened clips and full-length videos, on future dates.

274. Defendant directly participated in republication through instructing both public platforms and members of the public to "clip," "clip that," and otherwise repackage and reshare portions of his appearances to new audiences.

275. Defendant Hernandez induced and/or anticipated the direct republication of his recorded defamatory statements in substantially different form, including through video clips circulated on different social media platforms to new audiences.

276. Defendant Hernandez's statements were further republished through Defendant's issuance of subsequent statements that disseminated these same and/or similar false allegations concerning Plaintiff in substantially different form. These subsequent statements were issued to new, broader audiences using different and further-reaching platforms, including outlets such as VladTV, which not only has a massive subscription and public audience, but which specifically tailors its content to fans of hip-hop and professionals within the music industry.

277. These republications did not constitute mere recirculation of Defendant Hernandez's prior defamatory statements in their original form.

278. As described herein, Defendant Hernandez provided additional information, color, and commentary in his subsequent statements, modifying the substance and broadening his audience.

279. Defendant Hernandez reiterated his false claims defaming Plaintiff using different language and further embellishing his false claims against Plaintiff.

280. Defendant Hernandez's subsequent statements were intended to, and did, reach a new, broader audience than the audience engaged with the social media platform Clubhouse or the video entertainment podcast One Night with Steiny.

281. Defendant Hernandez's separate statements were made to media outlets with larger followings and generating more widely disseminated content than the platforms previously utilized by Defendant Hernandez.

282. Accordingly, each of Defendant Hernandez's statements published on or after October 16, 2025 constitutes a separate and independently actionable publication, including as a republication of his earlier Clubhouse and One Night with Steiny statements, and Defendant

Hernandez's earlier statements further demonstrate his knowledge of falsity and his ill will toward Plaintiff.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

## CONCLUSION AND DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff respectfully seeks relief from this Court and demands judgment against Defendant Hernandez in the following forms:

i. Actual and punitive damages against Defendant Hernandez in an amount to be determined at trial;

ii. Injunctive relief enjoining Defendant from engaging in further tortious conduct against Plaintiff; and

iii. Such other relief as the Court deems just and proper.

**DATED:** Brooklyn, New York
October 16, 2026

**KAISHIAN & MORTAZAVI LLC**
Attorneys for Plaintiff

By: ______________________
Maryanne K. Kaishian
55 Washington Street, Ste. 461
Brooklyn, New York 11201
T: (347) 662-2421
E: eservice@kaishianlaw.com

**PLAINTIFF VERIFICATION**

I, **KINTEA MCKENZIE,** the Plaintiff in the above action, affirms the following under penalties of perjury that the following is true:

1. I am the Plaintiff in the above matter.
2. I am over 18 years old and I am a lawful resident of Kings County, City and State of New York.
3. I have read the attached **COMPLAINT, DATED OCTOBER** 16 **2026**, and the relevant facts contained therein are true to my own knowledge.
4. As to matters therein alleged upon information and belief or otherwise based upon information not within my own personal knowledge, I believe them to be true.

**DATED:** 10/16/2026

**SIGN:** Kintea McKenzie

**PRINT:** Kintea Mckenze

STATE OF NEW YORK )
SS.
COUNTY OF KINGS )

On the 16 day of October in the year 2026, before me, the undersigned notary public, personally appeared Kintea Mckenze, known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is ascribed to the within instrument, and this individual executed the document in my presence.

Notarized online using audio-video communication technology

Maryanne K Kalshian
Online Notary Public
State of New York
Kings County
Commission #: 02KA0015799
Commission Expires: 11/07/2027

MKarshian

Notary Public